UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RICHARD MADURA, | : | Case No. 3:11-cv-118 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**ORDER THAT:(1) THE ALJ'S NON-DISABILITY FINDING IS FOUND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND REVERSED; (2) JUDGMENT IS TO BE ENTERED IN FAVOR OF PLAINTIFF AWARDING BENEFITS; AND (3) THIS CASE IS TO BE CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB") and supplemental security income ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 16-25) (ALJ's decision)).

## I.

Plaintiff filed applications for DIB and SSI on October 19, 2005. (Tr. 31-35, 37-38, 51-55, 471-476). He alleged a disability onset date of January 2, 2004, owing to Type II diabetes, hyperlipidemia, peripheral vascular disease ("PVD"),[1] and hepatitis C. (Tr. 51, 63). His insured status expired on December 31, 2009. (Tr. 60). Plaintiff's applications were denied initially and upon reconsideration. (Tr. 477-483). A hearing

---

[1] Obstruction of large arteries.

was held on January 16, 2009 before an ALJ.  A medical expert testified at the hearing.  (Tr. 484).

The ALJ issued his decision on March 11, 2009, finding that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 25).  Specifically, the ALJ found that Plaintiff had the RFC[2] to perform a reduced range of light work.[3]  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 5-7).  Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff turned 50 on April 27, 2010.  (Tr. 51).  Plaintiff has one year of college and special training in building maintenance.  (Tr. 69).  Plaintiff's past relevant work consists of sales clerk, light and semi-skilled; inventory clerk, medium and semi-skilled; produce clerk, light and semi-skilled; machine operator in parts manufacturing, light and unskilled; and delivery driver, medium and semi-skilled.  (Tr. 527-529).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

---

[2] The Agency's regulations define residual functional capacity ("RFC") as "the most you can still do despite your impairments."  20 CFR §§ 404.1545(a)(1), 416.945 (a)(1).

[3] Light work involves lifting no more than 20 pounds occasionally and 10 pounds frequently, and may require a good deal of walking or standing.  20 CFR §§ 404.1567(b), 416.967(b).

2. The claimant has not engaged in substantial gainful activity since January 2, 2004, the alleged onset date (20 CFR 404.1571, *et seq.* and 416.971, *et seq.*).

3. The claimant has the following severe impairments: diabetes, coronary artery disease, peripheral vascular disease, cirrhosis with normal liver function, and mild hypertension (20 CFR 404.1521, *et seq.*, and 416.921, *et seq.*).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he can lift 20 pounds occasionally and 10 pounds frequently and sit without limitation, but should not stand or walk more than a combined total of 2 hours during an 8-hour workday; should not perform tasks requiring repetitive or constant use of foot controls, leg controls, or similar controls involving the lower extremities and is limited to only occasional such use of such objects over the course of an 8-hour workday; should not climb ladders, ropes, or scaffolds, but may occasionally climb ramps and stairs; and should not be exposed to extremes of heat or cold.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 27, 1960 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

>       10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).
>
>       11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-24).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB or SSI.  (Tr. 25).

On appeal, Plaintiff argues that: (1) the ALJ erred in finding that his impairments did not equal a Listing; (2) the ALJ erred in rejecting the opinion of his treating physicians, and in relying instead on the testimony of the medical expert; and (3) the ALJ's RFC finding was equivocal and therefore, at the very least, should be remanded.  The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon

which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

Treatment records, dated April 25, 2002 through September 9, 2004, from CMH Memorial Hospital, were made a part of the record. A vascular study done on April 25, 2002 demonstrated, "[r]ight lower extremity moderate arterial insufficiency and left lower extremity moderate arterial insufficiency." (Tr. 176). On May 8, 2002, Plaintiff was seen by Dr. Mesh, a cardiovascular and thoracic surgeon, for bilateral lower extremity claudication. Plaintiff had "reduced femoral pulses bilaterally and absent left popliteal, dorsal pedal and posterior tibial pulses [and] [a]nkle/brachial indices are .6 bilaterally."

(Tr. 137-138, 144). Dr. Mesh noted that "Mr. Madura has multilevel lower extremity occulusive disease involving both the aortoiliac and femoropopliteal segments. His left side is worse than the right because he does have left superficial femoral artery occlusion." (*Id.*) A May 22, 2002 aortorgram revealed "[s]ignificant aortoiliac inflow disease with complete occlusion of left common iliac artery and multiple stenoses involving the right common and external iliac artery." (Tr. 132). On June 5, 2002, Dr. Mesh completed a basic medical form and diagnosed: limiting claudication. He claimed that Plaintiff was unable to work because of his pain. (Tr. 129). Plaintiff's standing, walking, lifting, and carrying was affected, and he was markedly limited in his ability to push/pull, bend, and perform repetitive foot movements. Plaintiff was unemployable for more than 12 months. An August 22, 2002 biopsy revealed cirrhosis of the liver. (Tr. 125). Plaintiff underwent an aortobifemoral bypass graft[4] on August 22, 2002. (Tr. 122-124).

The records from CMH Regional Health System show that Plaintiff was seen in the ER on July 11, 2004 for chest pain. (Tr. 172). The diagnosis was MRSA skin lesions, diabetes with hyperglycemia, and chest wall pain. (Tr. 173). Plaintiff was treated on August 2, 2004 for his diabetes. (Tr. 165-166). He was seen on August 23, 2004 for constipation and again on August 30, 2004 for urinary retention. (Tr. 167-170).

---

[4] This surgery is used to bypass diseased large blood vessels in the abdomen and groin. To bypass the blocked blood vessel, blood is redirected through a graft made of synthetic material.

Plaintiff was admitted and treated for orchiepididymitis,[5] enlarged prostate, urinary tract infection, diabetes, hypertension, and hyperlipidemia on September 14, 2004. (Tr. 145-164)

On October 6, 2005, Dr. Dori Thompson from The Samaritan Homeless Clinic, completed a basic medical form. She stated that Plaintiff had type II diabetes, hypertension, hyperlipidemia, and peripheral vascular disease. Plaintiff needed to be referred to a vascular specialist because his condition was deteriorating. (Tr. 178). His standing/walking was limited to less than one hour out of an eight hour day and he was markedly limited in his ability to push/pull and to perform repetitive foot movements. Dr. Thompson opined that Plaintiff was unemployable for between nine and eleven months. (Tr. 179).

Plaintiff underwent a CTA abdominal aorta/femoral runoff[6] on October 20, 2005. It revealed a patent aorto-bifemoral bypass and right superficial femoral arterial occlusion. (Tr. 200-201). Plaintiff had a SVI carotid Doppler on November 4, 2005 as a result of Plaintiff's blood pressure. It demonstrated left subclavian artery with 60 mm pressure, widely patent right subclavian artery, and bilateral internal carotid arteries with 16-49% stenosis. (Tr. 196-197). He underwent a cardiac catheterization on December 6,

---

[5] Inflammation of the testicle.

[6] Obtains photographs of the arteries.

2005 which revealed that both common iliacs were 100% occluded,[7] nonvisualization of the internal iliac arteries, and right side short occlusion of the superficial femoral artery. (Tr. 189).

Dr. Gary Lemmon, a vascular specialist, noted that on September 8, 2005, Plaintiff was treated for bilateral leg pain and cramping. He diagnosed diabetes, hypertension, hyperlidemia and PVD. (Tr. 229). Plaintiff had reduced pulses, claudication[8] of the buttocks, and shortness of breath. (Tr. 228). On October 5, 2005, he was seen by Dr. Sinnathamby for bilateral hip pain with walking and bilateral arm numbness on elevation. Dr. Sinnathamby found that Plaintiff had "evidence of recurrent vascular disease." (Tr. 226). The angiography showed "peripheral vascular disease involving the right SFA." (Tr. 224). An abdominal aortogram[9] was recommended. (*Id.*)

On December 16, 2005, Dr. Sinnathamby reported that Plaintiff's bilateral claudication limited his activity. The angiogram revealed that Plaintiff's "internal iliacs are being fed by collaterals." (Tr. 223). He recommended that Plaintiff see Dr. Lemmon about possible surgery. (*Id.*) On December 20, 2005, Plaintiff had diminished pulses. (Tr. 222). On that date, he saw Dr. Lemmon who stated, "[b]ecause of the increased risk

---

[7] Potentially life threatening condition in which the iliac arterial system obstructs blood supply – left untreated it can lead to tissue death.

[8] One of the symptoms of lower extremity peripheral artery disease – pain or discomfort in a group of muscles.

[9] Involves placement of a catheter in the aorta and injection of contrast material while taking x-rays of the aorta.

of internal iliac artery revascularization surgical dissection potential complications, I feel it is worthwhile to exhaust all medical attempts at treatment." (Tr. 221). Dr. Lemmon recommended surgery if Plaintiff's condition did not improve. (*Id.*) On February 14, 2006, Plaintiff had decreased pulses. (Tr. 218). By April 18, 2006, Dr. Lemmon stated that Plaintiff's PT pulses were not palpable in his right leg. (Tr. 217).

Dr. Willa Caldwell, a non-examining physician, reviewed the record on April 20, 2006, at the request of the State agency. (Tr. 209). She opined that Plaintiff could occasionally lift/carry up to twenty pounds and frequently up to ten pounds. He could stand/walk for six hours and sit for six hours. (Tr. 203). Plaintiff was limited to only occasional climbing of ladders, ropes, and scaffolds. (Tr. 204).

On August 14, 2006, Plaintiff had absent DP and PT pulses on the right and absent PT pulses on the left. He also had complaints of chest pain upon exertion as well as pain after walking one to one and a quarter blocks. (Tr. 211).

Dr. Rebecca Neiger, a non-examining physician, reviewed the record on October 23, 2006, at the request of the State agency. She found that Plaintiff could occasionally lift/carry up to twenty pounds and ten pounds occasionally and could stand/walk for two hours out of eight and sit for six hours. He could only occasionally perform foot controls. She noted that Plaintiff's condition had worsened. Dr. Neiger specifically found that his symptoms were attributed to a medically determinable impairment, that the severity or duration of the symptoms were not disproportionate to the expected severity or expected duration on the basis of his medically determinable impairment, and that the severity and

its affect on function was consistent with the total medical and nonmedical evidence. She also specifically noted that "[t]he allegations are credible." (Tr. 236).

On October 21, 2005, Dr. Thompson noted that Plaintiff was being treated for diabetes, hypertension, and peripheral vascular disease. She stated that his claudication symptoms were limiting his ability to walk and he needed a bus pass. (Tr. 281). On March 24, 2006, she wrote that Plaintiff was treated for diabetes, high blood pressure, high cholesterol, and hepatitis C. He was under the care of a vascular specialist for his peripheral vascular disease and would likely need additional arterial bypass surgery. On that date, Dr. Thompson opined that Plaintiff was unemployable because of his impairments. (Tr. 269).

Plaintiff was seen on November 1, 2006 for sores on his legs. (Tr. 263). He continued to have skin lesions in January 2007. (Tr. 260). By February 19, 2007, Plaintiff had complaints of depression and crying spells. (Tr. 256). Plaintiff had intermittent numbness, burning, and tingling in his feet and was diagnosed with peripheral neuropathy. (Tr. 251)

On March 6, 2007, Dr. Lemmon reported that Plaintiff had relapsed and was smoking again. He had "redeveloped a stenosis of the femoral artery" and he was complaining more of right leg pain as well as left buttock problems and was unable to perform work activity as a result. (Tr. 292). It was noted that a cane had been ordered to help his ability to walk. He had bilateral claudification of his lower extremities. (Tr. 291).

Plaintiff was seen at Good Samaritan Hospital's Clinic on June 20, 2007, and it was noted that he had absent pedal pulse bilaterally. (Tr. 327). Dr. Sinnathamby reported on February 1, 2008, that Plaintiff had chest pain and that the abnormal stress test indicated a possible previous infarct. He recommended a cardiac catheterization. (Tr. 360). Plaintiff was hospitalized from February 28, 2008 through March 8, 2008 for chest pain and abnormal cardiac stress test. A catheterization revealed:

> Three vessel coronary artery disease…with subtotal left anterior descending significant disease involving the second obtuse marginal branch and third OMB and significant disease involving the distal right coronary artery with possible ostial RCA disease as well…, wall motion abnormalities involving the anterolateral apical regions with a visually estimated ejection fraction of 40-45%, …[and] elevated left ventricular end diastolic pressure….

(Tr. 403). Plaintiff underwent four coronary bypass graft surgery on March 3, 2008. (Tr. 405-407).

Plaintiff was seen at Good Samaritan Hospital's Clinic on May 12, 2008 for complaints of left leg pain due to the vein harvesting. (Tr. 317). On June 25, 2008, it was noted that he was experiencing claudication after 50 feet. Plaintiff had mild mottling[10] of his right toe and diminished sensation of his right foot on exam. Plaintiff was hospitalized from June 27, 2008 through July 2, 2008. (Tr. 362-386). He underwent an aortogram thombectomy and patch angioplasty left aortobifem anatomosis as a result of right lower extremity ischemia and thrombosed aortobifemoral graft. (Tr. 362-363). On August 5, 2008, Plaintiff was seen in the emergency room for leg pain. On exam, he

---

[10] Mottled skin refers to blood vessel changes in the skin that cause a patchy appearance.

could not straighten his leg. (Tr. 347). Leg Doppler revealed septal collections of fluid in the groin. (Tr. 348, 353, 356-357). The diagnosis on discharge was sprained knee. (Tr. 349, 355).

Plaintiff was seen again on August 6, 2008 in the ER for worsening of his left leg pain. (Tr. 331). Dp pulse was diminished, pain on full extension, spasms of the hamstrings, tenderness, and swelling were noted on exam. (Tr. 332, 336-337). The diagnosis was left knee pain. (Tr. 332).

On November 24, 2008, Plaintiff was seen at Drew Health Center. He had claudication with walking and could only walk for one and a half blocks. He also was diagnosed with depression. His anti-depressant was increased and he was given a psychiatric resident referral. (Tr. 297). Plaintiff was seen on January 12, 2009 for an office visit and diagnosis with coronary artery disease ("CAD") and peripheral vascular disease ("PVD"). (Tr. 462).

At the administrative hearing, Plaintiff testified that peripheral artery disease and claudication were his primary disabling impairments. (Tr. 497-98). Plaintiff's attorney also indicated that diabetes was one of the impairments that contributed to his alleged disability. (Tr. 498). Plaintiff testified that he had to walk with a cane at all times and could walk no farther than one block or his legs and buttocks would start cramping up and he would collapse. (Tr. 500). Plaintiff indicated that his pain was constant and was typically seven out of 10 on the pain scale but could rise to 10 out of 10. (Tr. 520-21). His diabetes was relatively well-controlled by taking insulin. (Tr. 521).

Plaintiff had lived with a roommate for the past year and a half; his roommate paid $100 each month in rent and performed all of the household chores. (Tr. 493, 521-22, 525). Plaintiff worked after his alleged onset date for seven months—from May 2006 to January 2007—at the American Thrift store for 25 hours a week. (Tr. 496). At this job, Plaintiff performed primarily maintenance work, which included mopping and sweeping the floor, unloading trucks, cleaning the restrooms, and running the cash register. (Tr. 496-97). Plaintiff stated that he stopped working because his legs were giving out on him. (Tr. 497).

A medical expert, Dr. William Hauser, also testified at the administrative hearing after reviewing the entire medical record and listening to Plaintiff's testimony. Dr. Hauser testified that Plaintiff's impairments did not meet or equal a medical listing except for a very short period beginning in February 2008. (Tr. 502-03). Dr. Hauser stated that Plaintiff only met a listing until he had coronary bypass surgery in March 2008, which quickly treated and improved Plaintiff's condition. (Tr. 502-03). Dr. Hauser specifically testified that Plaintiff's impairments did not meet Listing 4.12 (peripheral artery disease) based on his ankle brachial index measurements. (Tr. 502). Dr. Hauser stated that Plaintiff's ankle brachial index measurements—around 0.60—were accurate and not affected by Plaintiff's diabetes. (Tr. 507, 508). Dr. Hauser stated that Plaintiff's peripheral artery disease that began in 2002 had improved with treatment, namely peripheral vascular surgery. (Tr. 512-13). Dr. Hauser also noted that Plaintiff's

hypertension and diabetes were well-controlled. (Tr. 518-19). Dr. Hauser opined that Plaintiff could stand and walk for no more than two hours, lift no more than 20 pounds occasionally and 10 pounds frequently, was unable to repetitively use foot controls, could occasionally climb ramps and stairs, and should have no exposure to extreme temperatures. (Tr. 515-17).

A vocational expert testified at the hearing that a hypothetical person with Plaintiff's vocational profile and the same limitations as identified in the ALJ's RFC finding would be unable to perform Plaintiff's past relevant work but would be able to perform a significant number of jobs in the regional economy, including 10,000 light jobs such as cashier, machine tender, and laundry folder and 15,000 sedentary jobs, including assembler, packager, and inspector. (Tr. 529-31).

Plaintiff argues that the ALJ erred in finding that his impairments did not equal a listing. Specifically, Plaintiff maintains that under 20 CFR Pt. 404, Subpt. P, Appendix 1, Section 4.00A, a claimant will be found disabled with "[r]esting ankle/brachial systolic blood pressure ratio of less than 0.50." The record shows that Plaintiff had a ankle/bracial systolic blood pressure ratio of .6 bilaterally. (Tr. 137-138, 144).

At step two of the disability determination process, the ALJ found that Plaintiff had the following severe impairments: diabetes, coronary artery disease, peripheral vascular disease, cirrhosis with normal liver function, and mild hypertension. (Tr. 18). At step three the ALJ determined that Plaintiff's impairments, both alone and in combination, did not meet or medically equal one of the impairments listed in 20 C.F.R.

Pt. 404, Subpt. P, App. 1.  Plaintiff argues that the ALJ's step three finding was not supported by substantial evidence.[11]

Here, Plaintiff contends that his impairment met Listing 4.12 (peripheral arterial disease).  Plaintiff's argument primarily focuses on his ankle brachial ratio.  Listing 4.12 requires Plaintiff's ankle/brachial blood pressure ratio to be less than 0.50.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.12A.  Plaintiff acknowledges that his ankle/brachial ratio (index) was above 0.50, as it was typically 0.60.  Plaintiff, however, contends that his ankle brachial ratio was elevated because of his diabetes and points to evidence[12] indicating that an ankle brachial ratio "may" be of limited value in "some" patients with diabetes.  While a medical expert testified that Plaintiff's ankle brachial ratio was accurate despite his diabetes, the medical expert was a specialist in pulmonary diseases, not vascular diseases.  (Tr. 507-08).  Moreover, the medical expert failed to explain why or how the ankle brachial ratio was accurate despite Plaintiff's diabetes.

Even if Plaintiff's ankle ratio did not meet the Listing, Plaintiff argues that the ALJ erred in finding that the combination of "[his] cardiac condition, with [his peripheral vascular disease] did not equal the listing."  The medical expert testified that Plaintiff's cardiac condition met or equaled the listing for a very short period beginning at the end of

---

[11] At step three of the disability process, Plaintiff bears the burden of proving that his impairment satisfied the requirements of the listing of impairments.  To meet this burden, Plaintiff must prove that his impairment met all of the requirements of one of the listed impairments.  *See* 20 C.F.R. § 404.1526(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfied all of the criteria in the listing.").

[12] "Diabetes mellitus . . . may result in misleadingly high blood pressure readings at the ankle."  20 CFR Pt. 404, Subpt. P, Appendix 1, § 4.00 G.7.c.

-15-

February 2008, when he had a cardiac catherization and lasted until he had coronary bypass surgery in March 2008.[13] (Tr. 502-03). However, even the medical expert conceded that Plaintiff's cardiac problems had "been present for years." (Tr. 510). The record supports a finding that Plaintiff's cardiac condition and PAD equaled the Listing.

**B.**

Next, Plaintiff maintains that the ALJ erred in rejecting the opinion of his treating physicians Drs. Thompson and Lemmon and in relying instead on the testimony of the medical expert and medical reviewers.

On June 22, 2006 Dr. Thompson, Plaintiff's treating physician ,opined that Plaintiff was unemployable because of his impairments. (Tr. 269) Additionally, Dr. Lemmon, Plaintiff's treating vasacular specialist, reported that Plaintiff had "redeveloped stenosis of the femoral artery" and was complaining more of right leg pain and left buttock problems. Dr. Lemmon opined that Plaintiff was unable to perform work activity as a result. (Tr. 292).

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

> One such standard, known as the treating physician rule,
> requires the ALJ to generally give greater deference to the
> opinions of treating physicians than to the opinions of non-
> treating physicians because these sources are likely to be the

---

[13] The ALJ relied on the conclusions of the medical expert in determining that Plaintiff did not meet the Listing instead of relying on the treating physicians (as this Court will address *infra*).

medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ did not even mention Dr. Thompson's opinion, let alone give a reason for rejecting it. (Tr. 23). Additionally, the ALJ gave no weight to Dr. Lemmon's opinion when making his RFC finding because he claimed that Dr. Lemmon's opinion was undetermined by the fact that Plaintiff began working 25 hours a week at a physically demanding job just two months after his opinion was rendered. (Tr. 23). However, first the record indicates that Dr. Lemmon's opinion was actually rendered 2 months after Plaintiff stopped working – it is dated March 6, 2007 and Plaintiff testified that he worked from May 2006 to January 2007. (Tr. 61, 292, 496). Therefore, the opinion is not contradicted. Second, Plaintiff's ability to work 25 hours a week does not support rejecting Dr. Lemmon's opinion, because the RFC[14] finding details Plaintiff's ability to perform *full-time* work hours. Plaintiff could not even perform part-time work because his legs were giving out on him. (Tr. 497). Therefore, Plaintiff's ability to work twenty five hours a week was not substantial evidence that supports a rejection of Dr. Lemmon's opinion of disability and a finding that Plaintiff could perform work activity for eight hours a day five days a week.

---

[14] "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A regular and continuing bases means 8 hours a day, for five days a week, or an equivalent work schedule." SSR 96-8p at 28.

-17-

Both Drs. Thompson and Lemmon were Plaintiff's long-term treating physicians, who actually saw and examined Plaintiff unlike the medical expert or the non-examining State agency reviewers. Moreover, Dr. Lemmon is a vascular specialist. (Tr. 292). The state agency reviewers included Dr. Caldwell (general practice), Dr. Neiger (internal medicine) and Dr. Houster (a specialist in pulmonary diseases).[15] None of these doctors' opinions is entitled to deference over the opinions of the treating physicians.

Accordingly, the Court finds that the ALJ improperly weighed the medical evidence by failing to give controlling weight to the treating physicians. The non-examining physicians' assessments do not constitute *substantial evidence* so as to overcome the findings of the treating physicians. Therefore, the proof of disability is strong and opposing evidence is lacking in substance. A remand in this matter would merely involve the presentation of cumulative evidence and would serve no useful purpose. *Felisky v. Bowen,* 35 F.3d 1027, 1041 (6th Cir. 1994)

## C.

Finally, Plaintiff argues that the ALJ's RFC finding was equivocal.

In his decision, the ALJ referred to Plaintiff's exertional level as both "sedentary" and "reduced range of light work." (Tr. 19, 21-24). The Commissioner claims that the ALJ committed a harmless transcribing error in mentioning sedentary work in his RFC finding, where his opinion makes clear that his RFC finding limited Plaintiff to light work. While the Court finds that the error indeed appears to have been clerical, it was

---

[15] The factors involved in weighing medical opinions include: examining relationship, treatment relationship, supportability, consistency, and specialization. 20 CFR § 404.1527(d)(1).

nonetheless significant. However, based on the Courts previous findings in Sections A and B, further analysis is not required.

### III.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987).

The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176; *see also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 772 F.2d 966, 973 (6th Cir. 1985). Such is the case here.

Here proof of disability <u>is</u> overwhelming and remand will serve no purpose other than delay. As fully recited herein, in view of the extensive medical record of evidence of disability, and the credible and controlling findings and opinions of treating physicians,

-19-

Drs. Thompson and Lemmon, proof of disability is overwhelming.

**IT IS THEREFORE ORDERED THAT:**

The decision of the Commissioner, that Plaintiff was not entitled to disability insurance benefits and supplemental security income beginning January 2, 2004, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**, and it is **REVERSED**; and this matter is **REMANDED** to the ALJ for an immediate award of benefits; and, as no further matters remain pending for the Court's review, this case is to be **CLOSED.**

Date: 1/20/2012

Timothy S. Black
United States District Judge